and parties are all set and ready to go. We'll just proceed. Good morning, Your Honors, and may it please the Court, David Thompson, for the Plaintiff Appellants in the Bhatti case. The FHFA is the most unaccountable agency in the United States history. It's unaccountable. Now, you mean in law, practice, theory, or what? I mean in terms of unaccountability to the President, the Congress, and this Court. The Director can't be removed except for cause. Congress can't control its budget. And this Court under 4617F has real constraints on its ability to control this agency. And that's why in Collins, the Fifth Circuit in Bank recently, by 12 to 4 votes, struck down this agency. Now, they didn't provide backward-looking relief as a remedy by a vote of 7 to 9 in the Fifth Circuit. And I'd like to pick up by answering the most recent submission by my friends at the Department of Justice. They put in a 28-J, answering our argument under the APA. We say that under Section 706 of the APA, this Court is required to set aside – the APA says, shall set aside – any agency action that's illegal. And they cite two cases to try to rebut that. The first is the Hecht case from 1944. The APA wasn't enacted until 1946. So it was a different statute that was at issue in Hecht. And that statute had language saying, you shall issue an injunction or other order. So it had an escape clause that the Supreme Court pointed to that isn't present in the APA. The other case they point to is Abbott Labs. Abbott Labs was decided in 1967 and suggested in dicta that there might be the ability to have a latches defense. But that was before the courts, a decade later, concluded that there was a six-year statute of limitations in the APA. And what the Supreme Court said to us two years ago in a case called SEA Hygiene is, quote, applying latches within a limitations period specified by Congress would give judges a legislation overriding role that is beyond the judiciary's power, close quote. So quite simply, they have no answer to our APA language about shall set aside illegal government conduct. Even if this Court were to look beyond the APA, Boucher is controlling. There's only one time that the United States Supreme Court has actually had to grapple with, do we provide backward-looking relief where the President's removal authority was infringed upon? And it was Boucher. And in Boucher, they vacated the illegal sequestration order that had been provided earlier. Let's go back to accountability and for cause. Yes. Wouldn't for cause include insubordination? Your Honor, for cause is deemed to be a very high standard. That is sort of the way in which Well, it doesn't even say for good cause. It just says for cause, right? It says for cause, and free enterprise suggests that the way for the last 80 years or so that Congress has specified independence is by saying for cause. So it's deemed to be a very high standard, and we see that in the language of 4511A, where Congress said that this agency quote shall be independent. And the way it intended to achieve that is by setting the for cause removal, and to suggest that it's – and Judge Griffith in the D.C. Circuit in his concurrence in the PHH – or his concurrence in the judgment in the PHH case suggested that well, maybe it's not that high a standard, and the President can get rid of these people pretty easily. And no other judge agreed with that, and I think appropriately so, because free enterprise suggests that is the way. That language of just for cause confers significant protection upon the Director. Your Honor. Didn't for cause say there has to be something else in addition to for cause? Well, a second layer, that's what distinguished the members of the Commission itself from the PCAOB. That was the holding, for sure, in free enterprise, was that second layer. But I think that the takeaway from free enterprise is that even a very small marginal expansion of Humphrey's executor is inappropriate. Of course, Humphrey's executor dealt with a bipartisan, multi-member, staggered term organization that was subject to the appropriations power and judicial – Let's talk about Bowser fast. Bowser is – and back in that period of time, the 80s, the Supreme Court did many of those where it required a joint resolution of Congress to decide on – that was done on the U.S. Sentencing Commission. It was done on many agencies where Congress invalid – where the court invalidated where Congress had the power to appoint executive people. We don't have that here. In fact, you say there's no congressional oversight, right? So they're different. Bowser's a very different case. It's different, but it's the same in this one respect, which is it's the only time where the Supreme Court has grappled with, okay, there was an infringement on the president's removal ability. What do we do about backward-looking relief? Myers is that, too. Well, there wasn't backward-looking relief, Your Honor. That wasn't an issue in Myers. So I think the main takeaway from Bowser is on this remedial point. Now, they cling to free enterprise, and they say, well, free enterprise didn't give backward-looking relief, and why are you entitled to it? And I make a couple of points about that. Number one, free enterprise was not brought under the Administrative Procedures Act, so it didn't have that shall-set-aside language. Number two, there was nothing to vacate there. There was an investigation, and the Supreme Court said, quote, no sanction was imposed. So there was nothing backwards to vacate. Now, they also point to free enterprise, and they say, for the separate question of forward-looking relief, look to free enterprise and just strike down the four-causal removal protection. That would be very inappropriate in this context because in free enterprise, both before and after the Supreme Court's remedy, the PCAOB remained an independent agency. But here, if this Court were merely to strike down the four-causal removal protection, it would take the most independent, unaccountable agency in the nation's history and turn it into a dependent agency, an agency that the executive would have plenary control over, that Congress could control through the budgetary process, that the judiciary had limited control over under 4617F. And so it would, Bauscher says, when you're crafting a remedy prospectively, you do not want to alter the balance that Congress had in mind, and this would radically transform an agency that was mandated under 4511A to be independent into one that is no longer. Well, you're familiar with the Ninth Circuit's opinion in Consumer Financial Protection Bureau? Yes. Yeah, okay. They think this is a very straightforward issue because you cite Morrison, you read the black letter of Morrison, you read the black letter of Humphrey's executive, there's not, you know, the Fifth Circuit's even wrong. This is not a tough case. Why isn't that the most direct approach to this? Well, there are Supreme Court cases. Yeah, well, the Morrison case, we're dealing with, number one, an inferior officer, the Court highlighted, number one. And number two, there was no policymaking and it had a by the Supreme Court. Here, everyone agrees, we're not dealing with an inferior officer. The director of this agency has significant powers, both as conservator but also as a regulator. You know, if we look at that remedy question beyond just Bauscher, we can see in Noel Canning that the Court invalidated backward what the NLRB had done for 20 months. Everything the NLRB had for 20 months was wiped away by the United States Supreme Court and Noel Canning. So they come up and they say, well, there's going to be chaos. You can't give this backward look. I think you went past Humphrey's executor. I know it's a 1935 case, but it's the United States Supreme Court just plainly saying it. Why doesn't that basically control us? It was a multi-member board and that's really important from the perspective of liberty. We know from Bauscher that the purpose of the separation of powers is to preserve liberty and when you've got a multi-member board, you have deliberation, you have compromise, and you can only go as far as that center vote will let you go. So you're anchored to the center and there's, of course, the opportunity for dissent, which is another important check and we don't have that here. Also in Humphrey's executor, that agency was subject to appropriation control. That's important because the president can veto an appropriations bill if he wants to try to control an agency. We don't have that here. The FHFA provides for its own assessments on the companies. In addition, in Humphrey's executor, that agency could be controlled by the judiciary. There was no analog to 4617F in Humphrey's executor. So it was a very different agency that was far more accountable to the American people and far more consistent with the separation of powers. So we have to distinguish Humphrey's executor? You should not, I would say yes, that you don't want to expand it and I think that's the teaching of free enterprise is that it should not be expanded. I'd like, if I may, to turn to the appointments clause question. We have account 3 that says that Mr. DeMarco was in an acting capacity for three years at the time of the network sweep. The position of the defendants in this case, make no mistake, is that it doesn't matter how long somebody is in an acting capacity that they can be there for all four years. The appointments clause is indifferent. It's that much of a speed bump that we know from our own cases. It's been forever. You can correct me. It's been a long time that we've had acting commissioners of social security, one of the most important agencies that have paid 20 some percent of all Americans money. Do you know how long we've had acting commissioners of social security? It has been in excess of two years. I know in excess of two years. I'm trying to make the point. I think it's been 20 years. How long has it been? Your Honor, I didn't think it was that long, but regardless. We've had a lot of acting commissioners of social security. Now, how is this different? Well, Your Honor, what we know from Eaton, from the Supreme Court, is that it has to be a temporary office. It cannot be for an indefinite period of time. But isn't an acting director a lot different than an appointment between terms? I mean, it doesn't function the same way. Well, Your Honor, this officer has the same power as acting director. He has the exact same power. And the appointments clause, the purpose of it, of course, is to make sure that the president puts in someone who will be able to get Senate confirmation. And it will not be very much of a protection for liberty if under their rule, they say there's no standard. There's nothing any court can do. And they say it's a political question. And that just can't be right. If you look at Noel Canning, Noel Canning, this was the exact same question that was before the United States Supreme Court. Does the four-cause provision even apply to an acting director? Yes, Your Honor, for a couple of reasons. Number one, under 4511A, it says that it shall be an independent agency. And it won't make a lot of sense to say, okay, we're going to be really independent when we have a director. But when we have an acting director, it shall no longer be independent. When the president decides on who the permanent director is going to be, there's no cause for removing the acting person, right? Well, but at 4512F, actually, that cuts our way, Your Honor, because under 4512F, it tells us when the acting director can go. And it's not, quote, until, until a new director has been confirmed by the Senate. It's actually even stronger. It doesn't require a cause. Well, it doesn't allow it even if there is cause. It's even stronger, 4512F, because it says he's in that position until the Senate confirms somebody else. And if we look under the Wiener case, Your Honor, Wiener was a case of statutory interpretation assessing when should we infer in the statute that there is four-cause removal protection. It said the test is you look at the nature and function of what the officer is doing. And here, the function of the acting director has the exact same powers that he would have otherwise. So for that reason alone, under Wiener, the court should find that the acting director has four- Well, help me with something very simple. Congress has legislated this issue, discussed this issue, fumed about this issue, and it's their prerogatives that are really stepped on by acting officials. Why shouldn't we defer to the Vacancies Reform Act and all the other statutes that you know exist about acting officers? The Supreme Court has said over and over again, Your Honor, that there are lots of reasons why the branches may barter with each other and barter away their rights under the separation of powers. But the separation of powers is not to protect the branches. It's to protect the people, Your Honor. It's to protect liberty. Yeah, but these are the people's representatives, the President and the Congress who are doing this. So I don't- They've rejected that. That argument's been made over- Okay, okay. Tell me a case that rejects that straight. I will do that in my rebuttal. Okay, thank you. Because I'd like to see it. Yes, absolutely, Your Honor. I don't know. We trust the people we elect a little bit more than that. Go ahead. Well, not in this context. Now, finally, non-delegation doctrine. Non-delegation doctrine. A majority of the Fifth Circuit sitting in bank said one of the reasons they were interpreting the APA the way the plaintiffs wanted to interpret there was because there would be no principle. And here, there is no intelligible principle by which they are for the interests of the agency or the interest of the regulated entities or any other interests because they point to the word may in 4617B2J and they say that's discretionary. So they're not even bound by that choice. Counsel, it says, if I'm quoting the law proper, it says put the regulated entity sound solvent condition and there are four or five different things listed. Boy, that's far better than some of the stuff the Supreme Court's done. Just and reasonable rates, regulating the public interest, fair and equitable. The Supreme Court has approved those and in 2019, in the Gundy case, summarized them all. Here's the key distinction, the fundamental distinction. In every one of those cases where it talks about public interest, Congress says you shall regulate in the public interest. And here, they didn't say that. They said you may regulate in the interest of the entity or of the agency. And by using the word may under Saxton, we're told that gives them discretion to do the opposite. So there is no principle here and I'd like, if I may, to reserve the remaining time for my rebuttal. Thank you. Thank you, Mr. Thompson. Mr. Ketterberg. These birds must be 10 and 10. Good morning. May it please the Court. I'm Rob Ketterberg for the FHFA Appellees. Plaintiffs' claims lack merit and the district court correctly dismissed them. There is no constitutional defect with FHFA whatsoever. And even if there were constitutional issues, they would not entitle the plaintiffs to the highly unusual relief they seek here. Do you agree they have standing? We do not agree. We do not agree, Your Honor. There are serious traceability and redressability problems. You disagree with the Fifth Circuit, right? We disagree with the Fifth Circuit. What was the vote in the Fifth Circuit on the standing? There were two judges who... No, what's the total? Tell me the vote. You don't know the vote. The... On standing, what was the vote? Like, you know, 9 to 7, 10 to 4, 16 to 0? 2 to 14. However... Okay, 14 to 4. Thank you. That's all I need. However, Your Honor, seven judges, the judges on the Fifth Circuit who dissented on remedy, said that the remedy that was given did not redress the injury of the shareholders. So, I mean, a fortiori, that means if there's no redressability, that's a third prong of Article 3 standing. And if there's no redressability, that what flows from that is that they don't have standing. I'd like to talk about the traceability problem because there's two of them. First of all, the transaction here was entered into by an official, an acting director, who did not have for-cause removal protection. We know that because if we line the statute up, there's two different subsections within the same statute, 4512. For a permanent director who at the will of the president. And if the president doesn't like what the acting director is doing, Judge Gronder, as you mentioned, he can appoint a permanent director or he can rescind that designation and designate someone else in the former acting director's place. And courts are supposed to construe statutory problems to avoid statutory provisions, to avoid constitutional problems, not to create them. But that's just the first reason there's lack of traceability. The second one, and more important in my view, is this was a two-way transaction where the counterparty, who is a necessary and indispensable party to the very thing they're complaining about, was fully under control of the president. Their whole theory is that this was a land grab by Treasury and that the conservator was complicit in it. So why would it make- It was a stock value grab, right? You said land grab? It was a land grab. That is their whole theory. You mean a stock value grab. Go ahead. Well, what they call- I'll use their language. It's massive financial windfall for Treasury. Okay. Go ahead. So Treasury put out a press release. This is from paragraph 60 of the complaint, page 31 of the joint appendix. Treasury put out a press release the same day of the transaction, proclaiming that every dollar of the earnings that Fannie and Freddie generate will be used to benefit the taxpayers. So in Saxton, when this court previously confronted the Third Amendment in the context of an APA challenge, it's funny because the shareholders actually took the exact opposite position they're taking today. They took the position that the Third Amendment was invalid because FHFA was not independent enough from the administration. And you'll see where the court addressed that as 901F3 at 959.06. So if anything, under plaintiff's theory, greater presidential control over FHFA would have just resulted in greater momentum for the transaction happening. I'd like to turn to the merits because the model that Congress followed when they created FHFA has been blessed by the Supreme Court in a series of cases, beginning with Humphrey's executor, running right up through Free Enterprise Fund. What's the closest case? We've got the cases in front of us. What's the closest one? Humphrey's executor. I'd say Humphrey's executor and Morrison are a close tie because both of them upheld the independence of an agency. And really, the relevant question here is simply whether having a single director as opposed to a multi-member board materially adds to the insulation from the president. And nothing in what plaintiffs have provided or what the Collins majority opinion says provides any sound reason to think that's the case. The scholarship, the academic literature that got people started thinking about this issue in the first place, ironically, it talks about multi-member leadership as something that enhances independence. It contributes to the independence of an agency. Bipartisan character, it's very ironic to me to hear that that's something that promotes presidential control because what it means is when the president has a spot come open that they're able to fill, they may actually have to promote, to have to appoint somebody from the opposite political party. Now, they say that the boards make better quality decisions. You know, you can have multiple deliberations between multiple people and you get better decision making than you might with an individual. And maybe so, maybe not. We can think of a lot of occasions where that might be the case, but there are other situations where quick, expedited leadership is called for. That's a policy question for Congress when looking at the functions that the agency performs to determine what model collegial decision making versus individual decision making is better suited for those functions. Another thing that's been said is that with a single director, a president could go all the way through a four-year term without ever being able to appoint new leadership. And with a multi-member but what we do know so far is FHFA has existed under three presidential administrations, all of which have gotten a chance to select an FHFA director. Now, certainly if you play this out into the future long enough, it could be the case that at some point there would be a director of FHFA that would stay over and do a new presidential term. That depends on a lot of things, how the sort of presidential terms line up on the calendar with the FHFA director's term, whether a president is elected to a second term, whether a director leaves early. Sometimes directors leave early, but you could have the very same phenomenon with a multi-member board depending on the term length and how the terms are staggered. And that's what the district court was talking about in this case when at page 19 of his opinion, there was another district judge that did a computation and found that 80 percent of presidential terms will get the chance to appoint a majority of the FTC, which was the agency and Humphrey's executor. I've also heard it said that while with a multi-member board, at least the president can have the opportunity to appoint a chair because sometimes the chairs of the multi-member agencies wield significant control over the direction of the agency. But the reason that doesn't work for them is that when the FTC was upheld in Humphrey's executor, the members of the FTC actually chose their own chair. The statute was subsequently amended and today the president appoints the chairman of the FTC, but it was not so at the time of Humphrey's executor. So it's impossible to see that fact as animating the reasoning for the Supreme Court's decision. I'd like to briefly address the remedial issue because my friend has raised the Boucher case. I think that's sort of his marquee case, and I heard him say that it's a backward-looking remedy. It's anything but. So let's look at the timing of Boucher. This concerned the new act of Congress, the deficit reduction statute for 1986. The lawsuit challenging the statute was brought before the ink was dry on Congress's What happened under the Deficit Control Act is that a process played out where the comptroller general, who is an arm of Congress, engages in certain executive functions, issues a sequestration order. The sequestration order came out on February 1. The court order invalidating came out on February 7, six days later. I don't think there's any doubt that Boucher would have come out much differently if somebody sued in 1991, five years later, to challenge what was going on in the 86 budget, which would be the equivalent to what we have here. That's just one of several reasons why Boucher is inapposite. Free Enterprise Fund, in contrast, my friend says there was no backward-looking relief requested there, but the complaint in Free Enterprise Fund, and it's available on PACER, shows that the plaintiffs sought an order in judgment nullifying and voiding any prior adverse action against Beck, Steadman, and Watts. That's paragraph three of the prayer for relief, and that's what the Supreme Court was talking about in Free Enterprise Fund when they rejected the plaintiff's thesis, which is that the removal restriction issue invalidated everything that PCAOB did. I'd like to briefly address the acting director claim, the appointments clause claim. There's no case ever that has held that an acting official stayed longer than the Constitution allowed, and let alone invalidated an agency action on that ground. The novelty of what the plaintiffs are asking for can't be overstated, and acting officials have been commonplace since the Washington administration judgment, and I do have the answer you were looking for. The Social Security Administration has had acting commissioners now 76 months since February of 2013. That's more than twice the amount of time that acting director DeMarco had been in his position at the time of the Third Amendment. But you don't have over a longer period of time because they've had acting even before that. Keep going. Don't waste your time on that. So the plaintiffs say that the court should infer a constitutional limit of two years because that's the maximum amount of time that recess appointees can serve, but that's mixing match and matching things that are not meant to be put together. Their alternative fallback argument is that the constitutional test should be reasonable under the circumstances, but they can't begin to explain how that would actually translate into a workable standard that courts could apply in practice, because essentially what it involves is a court sitting in judgment of the president's exercise of his nomination and appointment responsibilities, which has never been done. The key facts are in the possession of of the president and the president's chief of staff who are involved in presidential personnel selection process, and there's just simply no way to get at that information. And the de facto officer doctrine also precludes this claim. Your time's expired. Thank you, your honors. Thank you. Mr. Sendak. Thank you, your honor, and may it please the court. Jerry Sendak appearing on behalf of the Supreme Court. I just want to start with the remedial point that plaintiff's counsel raised at the beginning of his argument. The Supreme Court has been quite clear that whenever injunctive relief is sought, courts of course retain the power to, it is not a matter of right that injunctive relief is entered in courts, especially retroactive injunctive relief. And courts must consider the equities, they must consider the public interests, and in Heck v. Bowles, this court made clear that even if a statute says you shall enter an injunction, that does not relieve courts of their requirement and their ability to consider equitable matters and to not issue an injunction if equity demands it. And here, as the Fifth Circuit majority held, equity does not permit the setting aside of the Third Amendment, and that's true for a number of reasons. First, and this has already been discussed, Treasury was the counterparty to this transaction. So when plaintiffs hear their thrust of their FHFA at the time, but Treasury was the county party and of course the President had control over Treasury and could have demanded a different deal. Second, President Obama and now President Trump have both appointed permanent directors to FHFA. They could have selected individuals who didn't like the Third Amendment or instructed those individuals to work on renegotiating it, but contrary, and this is again as the Fifth Circuit found, the directors who have been In addition, there are other equitable considerations, as the Fifth Circuit mentioned. Plaintiffs here are cherry-picking the Third Amendment, which they don't like, which they feel doesn't benefit shareholders, but their theory would apply to everything that FHFA has done as conservator. And of course, they're not here challenging the things like the $450 billion bailout that Treasury supplied, and I want to be clear that Treasury remains on the hook for FHFA. Treasury and taxpayers are on the hook to provide additional funds, up to $250 billion worth. There's also the issue of plaintiffs' delay. They waited five years to bring this suit. They could have brought suit immediately after the Third Amendment was enacted. They did not. They waited to see how that would turn out, and again, Treasury could have lost money. They could still lose money under the deal if there's another crisis, and that delay alone is a reason to deny that backward-looking relief. So for all those reasons, this court should consider the equities and must consider the equities before granting any retrospective equitable relief. I also want to turn just quickly to the appointments clause and the idea that the acting director here served too long. First of all, there's obviously nothing in the text of the Constitution that defines or that discusses acting directors at all, let alone defines their tenure. And as Judge Benton pointed out, this is an issue that has been, since President Washington's time, left to the political process to decide, to the congressional process. Well, that's not quite true to say political when we have the Vacancy Reform Act and the other statutes you're well aware of. Well, yes. So to say left to political doesn't sound right unless you consider every law political. Yes. I mean, maybe that's a poor phrasing on my part, Your Honor. What I mean, it's been left to political. They've enacted a number of statutes over the years, and most recently, the Federal Vacancies Reform Act, in which they thought of these various questions. How long should a person serve? Is this intruding on the Senate's ability to give advice and consent if we allow an acting director to serve too long? And they came up with a solution, including the Federal Vacancy Reform Act, where people can serve much longer and have served much longer than the two years that plaintiffs are proposing or even the three and a half years that the acting director here served. And it's always been up to Congress to decide, and Congress has made those decisions. And here, plaintiffs are asking this court to come up with an arbitrary or seemingly arbitrary line at two years. That would invalidate the VRA in many of its applications where people have served longer than the two years. And plaintiffs also mentioned Noel Canning in their discussions. And Noel Canning, when the court set up the 10-day rule, that was based on history. They looked at the although there have been thousands, none have been made of less than 10 days. And so that's how they got the 10-day yardstick. Well, here the history is the opposite. The history shows that there have often been cases of acting directors serving much longer than the two years plaintiffs propose. We've already discussed the acting SSA commissioner who's served 76 months, much longer than here. And again, so there's no reason to adopt, and plaintiffs provide no sound reason to adopt that view. And then I just, again, talk for a moment about the acting director, again, not being subject to for-cause removal. That's a reason why this court doesn't need to even reach the constitutional issues here. The Third Amendment was decided by an acting director. The statute is clear. It lays out in one subsection, the permanent director, how that three subsections later, it talks about the appointment of an acting director and how long they can serve and they can be removed when someone new comes or when a permanent director is appointed. It doesn't discuss for-cause removal. So in fact, plaintiffs are asking this court to take the opposite of constitutional avoidance principles, to read in an implied for-cause provision that's not in the statute, and then to declare the statute unconstitutional, at least as to the acting director. And that is not the approach this court should take. In fact, it should take the opposite approach if there's any ambiguity of not reading in a for-cause removal for the acting director that would result in an unconstitutional statute. And that is the approach the D.C. Circuit took in Swan v. Clinton, where it was a very similar case. We had an individual who was serving on a board. He overstayed the time he was serving, so he was a holdover. And the court said, even if he had a for-cause removal during his tenure, once that tenure ended and he was effectively acting as an acting board member, we're not going to read in a for-cause removal because that could create constitutional problems. And that's the approach this court should take here if it reaches this particular question, that there's no reason to conclude that the acting director was subject to for-cause removal. And I would just answer one final question that came up in terms of cases related to the Appointments Clause. I would just point out in Buckley v. Vallejo was an Appointments Clause case in which the court found an Appointments Clause violation but yet refused to strike down past acts of the, in that case it was the Federal Election Commission. And again, on de facto officer doctrine grounds, but the same types of ideas apply in equitable, under equitable principles, that it would the markets, that homeowners, that the GSCs themselves have relied on. If your honors have no further questions. Thank you, Mr. Zinsdak. Mr. Thompson, your rebuttal? Thank you, your honor. So, Judge Benton, the case that I couldn't remember off the top is Noel Canning, and it says, quote, since the separation of powers exists for the protection of individual liberty, its vitality does not depend on whether the encroached upon branch approves the encroachment. Rather, policing the enduring structure of constitutional government when the political branches fail to do so is one of the most vital functions of this court. So, the fact that Congress acquiesces is not of any moment. Now, they raised the standing question, obviously, they lost that 14-2, and with good reason, because footnote 12 of free enterprise tells us that as a matter of law, we do not have to create a counterfactual world in a separation of powers case. We see that illustrated in the Wynn case from 2003, where it was a unanimous panel of the Ninth Circuit sitting that affirmed a conviction, and the government argued, hey, don't invalidate this, because, and there's no standing here, because it's unanimous. And the fact that there were two members of the panel that had affirmed the conviction was deemed irrelevant. Moreover, if we look at the facts beyond the fact that it's legally irrelevant, the president would have been confronted with very different incentives in a world in which he had control over the FHFA. It was on the eve of a presidential election. He had a Republican-controlled house. If he could have spent that money on affordable housing or other goals for himself, that might have been quite attractive. Also, you wouldn't just look at a counterfactual world at the time of the sweep. You'd have to create an entire counterfactual world going back to 2009 of what does a dependent agency look like. They talk about Humphrey's executor, but Humphrey's executor, the president, always had a voice because of that bipartisanship. They talk about remedial issues, and you're not always entitled to getting backward-looking relief. But if we look in case after case, Boucher, Noel Canning, Lucia, Chadha, the line-item veto case of Clinton versus City of New York, backward-looking relief was in all of them, and they can't cite to a single APA case that ignored the plain text of the statute. They've invoked free enterprise and said, well, that proves their point on remedy. And they point to the complaint. But by the time that case came to the United States Supreme Court, the investigation was over, and there was no sanction imposed, and there was nothing to vacate. They say there's no appointments clause case that goes my way. There's none that goes their way, and Eden is certainly much more favorable to me. It says it has to be for a limited time and temporary. They say, oh, well, there are people who have served for longer. They point it to four people in U.S. history that have served for more than two years. In their briefs, they have four people, and they're all from the last 20 years. That's not much of a historical constitutional pedigree. They talk about in Noel Canning, well, you know, they mixed and matched, and they got the 10 days from history. They didn't tell you where they got the three days from. They got the three days from looking at the adjoinments clause. They went, and they looked at other related parts of the Constitution. The dissent lamented that and said, look, we should have a bright line rule, but the important point is it was 9-0 rejecting political questions. Sotofsky was quoted by Scalia in dissent. None of them thought it was a political question, so that forecloses what the district court did here. There was a suggestion that, well, look, the directors have been appointed by other presidents, and they continue to defend the sweep. The directors, once they're in, they're independent. We know that because they disagree right now. The administration says the agency is unconstitutional, and Mark Calabria says, no, we're constitutional. We have a vivid example that, once they're in, they're independent. They claim we're cherry-picking. There's a statute of limitations. There's also Article III standing, and, oh, if they think we're cherry-picking, then get rid of the entire PSPAs. I don't think they want to give back their $100 billion in profit, however, and I see that my time has expired. Thank you, Your Honors. Thank you, Mr. Thompson. Thank you also to